**NO. 26-4017**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

COASTAL RANCHES CONSERVANCY
*Plaintiff–Appellant,*

vs.

TAVARES
*Defendant–Appellee*

---

Appeal from the United States District Court for the Central District of California
Civil Case No. 2:24-cv-00468-DSF-RAO
Hon. Dale Fisher

---

# PLAINTIFF-APPELLANT'S OPENING BRIEF

---

Erica A. Maharg (CA 297396)
Theresa M. Trillo (CA 349989)
Aqua Terra Aeris Law Group
8 Rio Vista Ave.
Oakland, California 94611
Phone: (510) 473-8793
Email: eam@atalawgroup.com

*Attorneys for Plaintiff-Appellant*
*COASTAL RANCHES CONSERVANCY*

Daniel Cooper (CA 153576)
Sycamore Law
1004 B O'Reilly Avenue
San Francisco, California 94129
Phone: (415) 360-2962
Email: daniel@sycamore.law

*Attorneys for Plaintiff-Appellant*
*COASTAL RANCHES CONSERVANCY*

October 13, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant Coastal Ranches Conservancy states it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... iii

TABLE OF AUTHORITIES ..... v

INTRODUCTION ..... 1

JURISDICTION ..... 4

STATEMENT OF ISSUES ..... 5

RELEVANT STATUTORY AND REGULATORY TEXT ..... 6

STATEMENT OF THE CASE ..... 7

I. PROCEDURAL HISTORY ..... 7

II. LEGAL BACKGROUND ..... 8

III. FACTUAL BACKGROUND ..... 11

A. Southern California Steelhead ..... 11

B. Gaviota Creek and SC Steelhead Habitat ..... 13

C. Essential Life Behaviors of SC Steelhead ..... 14

D. Caltrans and the Fish Passage Barriers at Issue. ..... 17

E. The District Court's Findings of Impacts to SC Steelhead from the Barriers. ..... 20

F. Findings by NMFS and Caltrans Outside of this Litigation. ..... 21

SUMMARY OF THE ARGUMENT ..... 23

ARGUMENT ..... 26

I. THE DISTRICT COURT ERRED AS A MATTER OF LAW BY FAILING TO FIND THAT THE BARRIERS CAUSE HARM. ..... 26

A. Standard of Review. ..... 26

B. The District Court Improperly Required a Population-Level Impact to Prove Harm. ..... 26

C. The District Court Erred by Requiring Appellant Demonstrate the Upstream Habitat Blocked by the Barriers Was Essential. ..... 30

D. The District Court's Factual Findings Are Sufficient to Demonstrate Harm under the Regulatory Definition in Place at the Time of the Violations. .............................. 32

1. Courts have consistently found that simply blocking access to historic habitat, as the Culverts do in this case, qualifies as harm and take. .......................................... 34

2. The District Court's findings that the Grade Control Structures impair movement of juvenile Steelhead in critical habitat also constitutes take. .............................. 36

II. THE COURT'S FACTUAL FINDINGS REGARDING IMPACTS TO STEELHEAD FROM THE BARRIERS WERE CLEAR ERROR. ............ 39

A. Standard of Review. ..................................................... 39

B. The District Court Clearly Erred by Ignoring Highly Probative Evidence by NMFS and Caltrans Demonstrating that the Barriers Harm SC Steelhead. ... 39

C. The District Court's Determination that Habitat Above the Culverts Was Not High Quality or Significant to SC Steelhead Was Not Supported by the Record. ............... 45

III. THE DISTRICT COURT'S CONSIDERATION OF UNDISCLOSED EXPERT TESTIMONY IS REVERSIBLE ERROR. ............................. 48

A. Standard of Review ...................................................... 48

B. The District Court Abused Its Discretion When It Failed to Exclude Undisclosed Expert Testimony as Required by Federal Rule of Civil Procedure 37(c)(1). ................ 48

CONCLUSION ..................................................................................... 51

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995) .......... 28, 36

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) .......... 9

*Cascadia Wildlands v. Scott Timber Co., 105 F. 4th 1144 (9th Cir. 2024)* .... 10, 26, 28, 31, 32, 33, 39, 40

*Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621 (9th Cir. 2017) .......... 28

*Compare Alliance Communs. Techs., Inc. v. AT&T Corp.*, 245 Fed. Appx. 583 (9th Cir. 2007) .......... 49

*Ctr. for Biological Diversity et al. V. Burgum et al.*, 2:26-cv-02474-TMC (W.D. Wash.) .......... 10

*Defenders of Wildlife v. U.S. Fish and Wildlife Service, et al.*, 3:26-cv-07507-VC (N.D. Cal.) .......... 9

*Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882 (7th Cir. 2020) .......... 50

*Environmental Protection Information Center et al. v. National Marine Fisheries Service, et al.*, 3:26-cv-07176-VC (lead) (N.D. Cal.) .......... 9

*Forest Conservation Council v. Rosboro Lumber*, Co., 50 F.3d 781 (9th Cir 1995) .......... 10

*GE v. Joiner*, 522 U.S. 136 (1997) .......... 48

*Islamic Inv. Co. of the Gulf (Bahamas) Ltd. v. Harper (In re Grand Jury Investigation)*, 545 F.3d 21 (1st Cir. 2008) .......... 50

*Murrelet v. Pac. Lumber Co.*, 83 F.3d 1060 (9th Cir. 1996) .......... 10

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803 (9th Cir. 2018) .......... 8, 11, 28, 29, 31

*Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782 (9th Cir. 2005) .......... 39, 47

*Old Chief v. United States*, 519 U.S. 172 (1997) .......... 48

Or. Natural Res. Council v. Allen, 476 F.3d 1031 (9th Cir. 2007) .......... 28, 29, 31

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs.*, 743 F. App'x 771 (9th Cir. 2018) .......... 48

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001) .......... 44

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Raimondo*, No. 1:20-cv-00431-DAD-EPG, 2022 U.S. Dist. LEXIS 44155, (E.D. Cal. Mar. 11, 2022)........35

*Palila v. Haw. Dep't of Land & Nat. Res.*, 639 F.2d 495 (9th Cir 1981)................10

*Petrone v. Werner Enters.*, 42 F.4th 962 (8th Cir. 2022) .......................................50

*Puyallup Tribe of Indians v. Nat'l Marine Fisheries Service et al.*, 26-cv-05788-TMC (W.D. Wash.)..........................................................................10

*San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*, 49 F.4th 1242 (9th Cir. 2022) ........................................... 8, 10, 12, 15

*Scamihorn v. Gen. Truck Drivers, Local 952*, 282 F.3d 1078 (9th Cir. 2002)..........9

*Sierra Club & S.C. Wildlife Fed'n v. Kolnitz*, No. 2:16-cv-03815-DCN, 2017 U.S. Dist. LEXIS 128462 (D.S.C. Aug. 14, 2017).......................................35

*State of California et al. v. Burgum et al.*, 3:26-cv-10071-VC (N.D. Cal.) ............10

*Swinomish Indian Tribal Community et al. v. National Marine Fisheries Service*, 2:26-cv-02473-TMC (W.D. Wash.) ................................................10

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978)................................................ 8, 10

*United States v. Abel*, 469 U.S. 45 (1984) .............................................................48

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009)................................ 39, 45

*Wagner v. Cty. of Maricopa*, 747 F.3d 1048 (9th Cir. 2013) .................................48

*White v. United States Army Corps of Eng'rs*, No. 3:22-cv-06143, 2023 U.S. Dist. LEXIS 190274 (N.D. Cal. Oct. 23, 2023) ............................................29

**FEDERAL STATUTES**

16 U.S.C. § 1531(b) ..........................................................................................32

16 U.S.C. § 1532(19) ...................................................................................... 6, 9, 27

16 U.S.C. § 1532(5) ..........................................................................................37

16 U.S.C. § 1532(5)(A).......................................................................................13

16 U.S.C. § 1533 ...............................................................................................6

16 U.S.C. § 1533(a)(3)(A) ..................................................................................13

16 U.S.C. § 1535 ...............................................................................................6

16 U.S.C. § 1536 ......................................................................................... 9, 29

16 U.S.C. § 1536(b)(4).......................................................................................29

16 U.S.C. § 1536(o)(2).......................................................................................29

16 U.S.C. § 1538(a)(1)(B) ........................ 1, 2, 4, 5, 8, 9, 10, 25, 27, 29, 30, 31, 51
16 U.S.C. § 1539 ........................................................................................6, 9
16 U.S.C. § 1540(c) ........................................................................................4
16 U.S.C. § 1540(g) ........................................................................................4
28 U.S.C. § 1291 ........................................................................................4
28 U.S.C. § 1331 ........................................................................................4
28 U.S.C. § 2201 ........................................................................................4

**FEDERAL REGULATIONS**

50 C.F.R. § 222.102 (2026) ............................................................ 2, 6, 9, 32, 39
50 C.F.R. § 402.02 ........................................................................................29

**FEDERAL RULES**

Fed. R. App. P. 4(a)(1)(A) ........................................................................................4
Fed. R. Civ. P. 37(c)(1)........................................................ 3, 25, 47, 48, 49, 50

**STATE STATUTES**

Cal. Sts. & Hy. Code § 156(a) ........................................................................................43

**OTHER AUTHORITIES**

62 Fed. Reg. 43937 (Aug. 18, 1997) ........................................................................12
70 Fed. Reg. 52488 (Sept. 2, 2005) ........................................................................37
91 Fed. Reg. 43300 (July 14, 2026)........................................................................9
91 Fed. Reg. 43305 ........................................................................................9
9th Cir. R. 28-2.7 ........................................................................................6

## INTRODUCTION

Plaintiff-Appellant Coastal Ranches Conservancy ("Coastal Ranches" or "Appellant") seeks to hold Defendant-Appellee Tony Tavares, acting in his official capacity as director of the California Department of Transportation ("Caltrans" or "Appellee"), responsible for the unlawful take of endangered Southern California Steelhead ("SC Steelhead"), in violation of section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1)(B). SC Steelhead are listed as endangered under the ESA, and Gaviota Creek—where the violations took place—has one of the last remaining viable populations of SC Steelhead in the region.

Highway 101 along Gaviota Creek, which Caltrans constructed, maintains, and operates, includes twelve concrete grade control structures ("Grade Control Structures") that span the width of the creek. Upstream of the Grade Control Structures are two impassable culverts ("Culverts"). The Grade Control Structures and Culverts (collectively, the "Barriers") impede or block SC Steelhead from moving into upstream habitat, including rearing and spawning grounds and, thus, take SC Steelhead in violation of ESA section 9.

Since 2012, the National Marine Fisheries Service ("NMFS"), the federal agency charged with protecting and restoring SC Steelhead, has identified the Caltrans' Barriers as *the major threat* to SC Steelhead in Gaviota Creek and found that the Barriers must be removed to conserve the species. Similarly, beginning in

2015, in every statement outside of this litigation, and in sworn testimony in this action, Caltrans has acknowledged the Barriers impede SC Steelhead passage and block access to habitat that NMFS has designated as critical to the species. Yet only in this litigation, Caltrans asserts the Barriers do not harm the species.

Despite this evidence, the District Court found the Barriers do not harm SC Steelhead, under the statute or 50 C.F.R. § 222.102, and thus, that Caltrans has not taken SC Steelhead in violation of ESA section 9. In making this determination, the District Court made both legal and factual errors.

First, the District Court applied legal standards that have been rejected by the Ninth Circuit. Specifically, the District Court required Coastal Ranches show that the Barriers harm the SC Steelhead population as a whole, not just individuals. Moreover, the District Court also required that Coastal Ranches show that the habitat blocked by the Barriers is necessary to the population. Ninth Circuit precedent establishes that neither showing is required, and the District Court's decision should be reversed on these grounds.

Despite its incorrect application of the law, the District Court did properly find that the Barriers modify habitat such that SC Steelhead are prevented from accessing habitat. Specifically, the District Court found that the Culverts are impassable to all SC Steelhead and that the upstream habitat is therefore inaccessible. The District Court also found that the Grade Control Structures

impede the passage and movement of juvenile SC Steelhead downstream of the Culverts. These findings sufficiently demonstrate harm, as a matter of law, and this Court should accordingly find that take has occurred based on these findings.

Second, even if the legal standard the District Court applied was proper, the District Court clearly erred in its factual findings because it wholly ignored the findings of NMFS and Caltrans that the Barriers harm SC Steelhead. The District Court also determined that the habitat upstream of the Culverts was not of high quality, a factual determination that had no support in the record. On these bases, the District Court's decision should also be reversed.

Third, the District Court erred by accepting undisclosed expert testimony regarding the quality of the habitat upstream of the Culverts proffered by Appellee's expert witness for the first time at trial. The District Court's refusal to exclude this evidence abused its discretion under Federal Rule of Civil Procedure 37(c)(1), providing another ground for reversal.

In short, the District Court erred by applying the wrong legal standard for harm, by finding facts that were clearly not supported by the evidence, and by accepting evidence that was inadmissible and prejudicial to Appellant. These errors led the District Court to improperly find that the Barriers—an acknowledged injury to SC Steelhead and habitat in Gaviota Creek—do not harm or take SC Steelhead

in violation of ESA section 9. This decision is contrary to law and fact, undermines the purposes of the ESA, and brings an endangered species closer to extinction.

## JURISDICTION

Federal district court jurisdiction in this case is proper pursuant to 28 U.S.C. section 1331, as an action arising under the laws of the United States; pursuant to 28 U.S.C. section 2201 as an action for declaratory relief; and pursuant to the ESA, 16 U.S.C. sections 1540(c) and (g). The ESA authorizes citizen suits against "any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this Act or regulation issued under the authority thereof." 16 U.S.C. § 1540(g).

Appellate jurisdiction in this matter is proper pursuant to 28 U.S.C. section 1291 as an appeal of a final decision of a U.S. District Court. Appellant timely filed this appeal within 30 days of the District Court's entry of judgment for Appellee. 1-ER-0002; 8-ER-1572; Fed. R. App. P. 4(a)(1)(A). The District Court entered final judgment on May 21, 2026, which disposed of Coastal Ranches' claims. 1-ER-0002. Coastal Ranches filed this timely appeal on June 19, 2026. 3-ER-1572.

## STATEMENT OF ISSUES

Coastal Ranches appeals the District Court's Judgment in favor of Caltrans. This appeal presents the following issues:

1. Whether the District Court applied an erroneous legal standard when it determined that the Highway 101 Caltrans' Barriers do not constitute "harm" and thus "take" of endangered SC Steelhead on Gaviota Creek under ESA section 9, 16 U.S.C. § 1538(a)(1)(B), where the District Court erroneously required Appellant to prove (a) "harm" to the population as a whole and/or (b) that the lost habitat was essential to the species.

2. Whether the District Court committed clear factual error when it found that the Barriers did not harm SC Steelhead.

3. Whether the District Court abused its discretion when it admitted undisclosed expert opinions offered by Dr. Paul DeVries.

## RELEVANT STATUTORY AND REGULATORY TEXT

In accordance with 9th Cir. R. 28-2.7, Appellant provides the following relevant statutory and regulatory text:

**16 U.S. Code § 1538 - Prohibited acts**

(a)(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to— . . . (B) take any such species within the United States or the territorial sea of the United States . . . .

**16 U.S. Code § 1532 - Definitions**

(19) The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

**50 C.F.R. § 222.102 – Definitions**[1]

Harm in the definition of "take" in the Act means an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering.

[1] Although this regulation was rescinded after trial in this case, it is still applicable here. *See infra*, note 5.

## STATEMENT OF THE CASE

### I. PROCEDURAL HISTORY

Coastal Ranches initiated this federal citizen suit on January 18, 2024. *See* ECF No. 1 (Complaint). The District Court held a bench trial on October 7-8, 2025. 1-ER-0002. Appellant first called Doug Campbell, a representation of Coastal Ranches, who had extensive personal experience with Gaviota Creek. 4-ER-0433–34, 4-ER-0441, 4-ER-0444–45 (Campbell).[2] Appellant called three experts: Mr. Mark Allen, a fisheries biologist, to testify as to the impacts of the Barriers (*see* 4-ER-0508–13 [Allen]); Dr. Doug Shields, an engineer, providing engineered solutions to remedy the Barriers' harms (*see* 4-ER-0571–72 [Shields]); and Erika Cleugh, a California Department of Fish and Wildlife biologist who was designated as an expert in SC Steelhead and impacts from the Barriers (4-ER-0473–77 [Cleugh]). Appellee called four staff members, one of which was designated as an expert biologist, Ms. Sarah Sandstrom. *See* 5-ER-0772–79 (Sandstrom). Appellee also called as an expert, Dr. Paul DeVries, a fisheries biologist. *See* 5-ER-0854–57 (DeVries).

The District Court filed its Findings of Fact and Conclusions of Law ("FFCL") and entered final judgment on May 21, 2026. 1-ER-0004; 1-ER-0002.

[2] For the Court's reference, Coastal Ranches indicates which witness testified in parentheticals when referencing deposition, written, or oral testimony.

The FFCL determined that the Barriers *do* block or impede SC Steelhead passage and/or migration throughout Gaviota Creek but that "take" had not occurred on the basis that Coastal Ranches had not demonstrated the Barriers harm the SC Steelhead population as a whole. *See* 1-ER-0007–9, FFCL ¶¶ 21-22, 26-28, 32, 35-37 (fact); *see* 1-ER-0011–13, FFCL ¶¶ 6-9 (law).[3] Thus, the District Court found in favor of Appellee. 1-ER-0013, FFCL ¶ 9 (law); 1-ER-0002.[4]

Appellant filed this timely appeal on June 19, 2026. 8-ER-1572.

## II. LEGAL BACKGROUND

> Congress enacted the [ESA] "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). The purpose of enacting the ESA was "to require agencies to afford first priority to the declared national policy of saving endangered species." *Id.* at 185.

*San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*, 49 F.4th 1242, 1244 (9th Cir. 2022). "The ESA accomplishes its purpose in incremental steps, which include protecting the remaining members of a species." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018) (citations omitted). ESA section 9 prohibits any person from unauthorized

---

[3] For clarity, when citing to the FFCL, Appellant will indicate whether the reference is to a finding of fact (fact) or a conclusion of law (law).

[4] The District Court also dismissed Appellant's second cause of action, which alleged Caltrans violated ESA section 9 by taking SC Steelhead during an emergency project without a permit, as moot. Coastal Ranches does not appeal that order.

"take" of any individual endangered species. *See* 16 U.S.C. § 1538(a)(1)(B). "Take" includes to "kill," "harm," "trap," or "harass" any individual member of a listed species. *See* 16 U.S.C. § 1532(19). Take of an endangered species is prohibited, unless in compliance with an incidental take statement or an incidental take permit. *See* 16 U.S.C. §§ 1536, 1539.

NMFS has defined "harm" as significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.[5] This aligns with Congressional intent: when

---

[5] After trial and the District Court's order, NMFS and U.S. Fish and Wildlife Service (collectively, the "Services") finalized a rule rescinding the definition of harm, which became effective on September 16, 2026. U.S. Fish and Wildlife Service; National Oceanic and Atmospheric Administration, Rescinding the Definition of "Harm" Under the Endangered Species Act, 91 Fed. Reg. 43300, 43316 (July 14, 2026). However, this rule change has no impact on the Court's analysis of whether Caltrans harmed SC Steelhead. "Regulations cannot be applied retroactively unless Congress has so authorized the administrative agency and the language of the regulations requires this result." *Scamihorn v. Gen. Truck Drivers, Local 952*, 282 F.3d 1078, 1083 (9th Cir. 2002), citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result . . .."). The rules states that it "is setting prospective standards only." 91 Fed. Reg. at 43305. Thus, the rule cannot affect whether Caltrans committed take prior to its effective date.

The recission of the harm definition is undergoing numerous challenges, including six actions in the Ninth Circuit. *See Environmental Protection Information Center et al. v. National Marine Fisheries Service, et al.*, 3:26-cv-07176-VC (lead) (N.D. Cal.); *Defenders of Wildlife v. U.S. Fish and Wildlife Service, et al.*, 3:26-cv-07507-VC (N.D. Cal.); *State of California et al. v. Burgum et al.*, 3:26-cv-10071-

(footnote continued on next page)

adopting the ESA, "Congress was informed that the greatest threat to endangered species is the destruction of their natural habitat." *Palila v. Haw. Dep't of Land & Nat. Res.*, 639 F.2d 495, 498 (9th Cir. 1981), citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 179 (1978) ("*TVA*"). Accordingly, modifying a species' habitat in a manner reasonably certain to harm an endangered species by impairing a biologically essential behavior constitutes take under ESA section 9. *See Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783-84, 787-88 (9th Cir. 1995) (essential behaviors include breeding, feeding, or sheltering); *Marbled Murrelet v. Pacific Lumber Co.*, 83 F.3d 1060, 1067 (9th Cir. 1996); *Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1156 (9th Cir. 2022). Courts have repeatedly found that structures blocking or impairing movement and migration of endangered anadromous fish harm the species. *See, e.g., San Luis Obispo Coastkeeper*, 49 F.4th at 1246; *Nw. Envtl. Def. Ctr. v. United States Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1296-1299 (D. Or. 2011); *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo,* 758 F. Supp. 3d 1153, 1169-70 (C.D. Cal. 2024) ("*Cnty. of San Luis Obispo*"), overruled on other grounds by *San Luis*

VC (N.D. Cal.) (State of California alleging that harm necessarily includes habitat modification); *Swinomish Indian Tribal Community et al. v. National Marine Fisheries Service*, 2:26-cv-02473-TMC (W.D. Wash.) (lead consolidated case) *Ctr. for Biological Diversity et al. V. Burgum et al.*, 2:26-cv-02474-TMC (W.D. Wash.); *Puyallup Tribe of Indians v. Nat'l Marine Fisheries Service et al.*, 26-cv-05788-TMC (W.D. Wash.).

*Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590 (9th Cir. 2025), citing *Nat'l Wildlife Fed'n*, 886 F.3d at 818; *Wishtoyo Found. v. United Water Conservation Dist.*, No. CV 16-3869-DOC (PLAx), 2018 U.S. Dist. LEXIS 174505, *64 (C.D. Cal. Sep. 23, 2018).

## III. FACTUAL BACKGROUND

### A. Southern California Steelhead

The species *Oncorhynchus mykiss* ("*O. mykiss*") occurs in two forms: (1) resident freshwater fish that stay in their natal streams for their entire lives, commonly referred to as "rainbow trout;" or (2) a sea-run (anadromous) form, referred to as "steelhead." 1-ER-0005, FFCL ¶ 2 (fact); 2-ER-0216, Plaintiff's Amended Findings of Fact and Conclusions of Law ("PFOF") 21 (stipulated fact). Steelhead are born and grow in inland streams, migrate to the ocean for most of their life, and then return to their natal streams to breed. *See* 2-ER-0249 (DeVries); *see also* 3-ER-0284 (Allen); 7-ER-1231 (NMFS). Steelhead can migrate to and from the ocean multiple times during their lives. *See* 7-ER-1232 (NMFS). Rainbow trout and steelhead share genetics that allow rainbow trout to spawn juveniles that migrate and vice versa. 1-ER-0005, FFCL ¶ 4 (fact); 2-ER-0216, PFOF 23 (stipulated fact). "A key factor in the present and potential for future survival of Steelhead is the production of smolts [or juveniles] as the offspring of residential adult *O. mykiss*." *Wishtoyo Found.*, 2018 U.S. Dist. LEXIS 174505 at **33-34; *see also* 7-ER-1243 (NMFS).

SC Steelhead are listed as endangered under the ESA. *See* 1-ER-0005, FFCL ¶ 1 (fact); NOAA, Endangered and Threatened Species: Listing of Several ESUs of West Coast Steelhead, 62 Fed. Reg. 43937 (Aug. 18, 1997); *San Luis Obispo Coastkeeper*, 49 F.4th at 1244 (SC Steelhead "have been identified as being in danger of extinction throughout all or a significant portion of its range." [quote/citation omitted]). SC Steelhead are a distinct population segment ("DPS"), "because they are substantially reproductively isolated from other populations and contribute significantly to the ecological or genetic diversity of the biological species." *San Luis Obispo Coastkeeper*, 49 F.4th at 1244; *see also* 7-ER-1213 (NMFS). SC Steelhead's range extends from the border of Mexico to the Santa Maria River in San Luis Obispo County. *Id*. Since all juvenile *O. mykiss* can become anadromous SC Steelhead, all juveniles are endangered for the purposes of the ESA. *Wishtoyo Found.*, 2018 U.S. Dist. LEXIS 174505 at **35-36.

The population of SC Steelhead is critically low, rendering the species highly endangered. *See* 1-ER-0005, FFCL ¶ 3 (fact) ("Adult steelhead sightings in the Southern California region are rare"), citing 3-ER-0286 (Allen); 7-ER-1213 (NMFS) (estimating that "annual runs have declined dramatically from 32,000-46,000 returning adults historically, to currently less than 500 returning adults"); 7-ER-1432 (NMFS) (noting over 25 years, only 177 adult SC Steelhead have been observed). NMFS has found that "[t]he risk of permanently losing the anadromous

phenotype [*i.e.*, steelhead life form] over the long term may be very high and likely increasing *due to the lack of unobstructed migration corridors* between upstream drought refugia and the Pacific Ocean" . . .. 7-ER-1431 (NMFS) (emphasis added).

### B. Gaviota Creek and SC Steelhead Habitat

The Gaviota Creek watershed "encompasses an area of approximately 94 square miles." 6-ER-1004 (Caltrans). Gaviota Creek flows from the San Ynez Mountains to a lagoon and the ocean at Gaviota State Park. *Id*. "Gaviota Creek flows through a confined canyon, which has been further restricted by bank stabilization associated with [State Route]-101." *Id*.

SC Steelhead were historically and are currently present in Gaviota Creek. *See* 1-ER-0005, FFCL ¶ 5 (fact) ("Gaviota Creek…historically and currently provides habitat spawning grounds for steelhead"); 6-ER-1006-1017 (Caltrans); 2-ER-0137 (Sandstrom) (acknowledging Gaviota Creek supports steelhead). Gaviota Creek, from the Pacific Ocean to just below the Giorgi Culvert, is designated as "critical habitat" for SC Steelhead under the ESA. 2-ER-0229, PFOF 97 (stipulated fact).[6] NMFS has designated Gaviota Creek as a "Core 2" population for SC Steelhead (2-ER-0229, PFOF 98 [stipulated fact]), meaning it is a population that

[6] The ESA requires that NMFS, "to the maximum extent practicable," designate critical habitat for species listed as endangered or threatened. 16 U.S.C. § 1533(a)(3)(A). "Critical habitat" is habitat that is "essential to the conservation of the species." 16 U.S.C. § 1532(5)(A).

is necessary for the species to achieve a viable population within a biogeographic population group ("BPG"). 3-ER-0284–85 (Allen) (citing NMFS 2012, p. 7-4 [7-ER-1302]).

Gaviota Creek is within the Conception Coast BPG. 3-ER-0285 (Allen). Gaviota Creek is particularly important because it contains one of the larger basins in the BPG. 3-ER-0286 (Allen); 6-ER-1108 ("Gaviota Creek is one of the most biologically unique and important watersheds in the region."); 6-ER-1122; *see also* 4-ER-0487–88 (Cleugh) (Gaviota Creek is one of the most valuable streams because the "region has very few steelhead streams … [and] many of the streams are blocked…. Gaviota is one of [the streams] that still has a viable population…").

### C. Essential Life Behaviors of SC Steelhead

Two types of volitional movement essential to SC Steelhead are at issue in this litigation: (1) migration between the ocean and freshwater creeks; and (2) freedom to move within the freshwater creek. These essential life behaviors are uniquely adapted to the climate in the region that SC Steelhead inhabit.

Southern California and specifically the Gaviota Creek watershed has a Mediterranean climate, with most precipitation falling between December and March, followed by a long dry season. 7-ER-1214 (NMFS); *see also* 3-ER-0346 (Allen). Precipitation varies significantly from year-to-year in the Gaviota Creek

watershed. 7-ER-1214 (NMFS). During rain events, flow in Gaviota Creek increases abruptly. *See* 7-ER-1245–46 (NMFS); 2-ER-0187 (Lindt). Somehow sensing major rain events while at sea, adult SC Steelhead wait for these high flow events to migrate upstream. 2-ER-0252 (DeVries). Because these events are limited due to the nature of climate, opportunities for adult SC Steelhead upstream migration are rare and time limited. *See id.* (DeVries); 3-ER-0315 (Allen).

The parties agreed that migration to and from the Pacific Ocean is at the core of the SC Steelhead life cycle. *See* 2-ER-0249 (DeVries) ("Steelhead…live in both freshwater and oceanwater"); *see also* 3-ER-0284 (Allen) ("critical component of the steelhead's life … is access to and from the ocean"); 7-ER-1231–32 (NMFS) ("Steelhead are a highly migratory species."); 7-ER-1247–48 (NMFS) (describing spawning migration); 1-ER-0005, FFCL ¶ 2 (fact) (finding SC Steelhead "return from the sea into freshwater rivers and streams in order to spawn"). This is an essential behavioral pattern. *See* 4-ER-0513 (Allen) (providing examples of "central behaviors"); *see also San Luis Obispo Coastkeeper*, 49 F.4th at 1246 ("operation of [] Dam harms [SC] Steelhead by impairing their ability to migrate and reproduce").

Before migrating, juveniles or smolts rear for one to three years in freshwater. 6-ER-1016, Trial Ex. 27 (Caltrans). Within freshwater, "optimal habitat for steelhead . . . can be characterized by clear, cool water with abundant

stream cover . . ..” *Id*. The Southern California climate causes water temperatures to increase and even dries out parts of Gaviota Creek during the dryer months. *See* 3-ER-0305 (Allen); 2-ER-0255 (DeVries). Cool-water pools that are important to all stages of *O. mykiss* become less frequent and shallower during the summer and fall. 3-ER-0305 (Allen); 6-ER-1027 (Caltrans) (“Over-summering habitat, typically cool and shaded areas in rivers and streams, provides important refuge and resources for steelhead during warmer months.”). Experts on both sides testified that SC Steelhead move within freshwater creeks, like Gaviota Creek, to seek out better habitat. 4-ER-0552–53 (Allen); 5-ER-0823–24 (Sandstrom); 1-ER-0008, FFCL ¶ 27 (fact) (finding “[j]uvenile steelhead and resident trout can benefit from being able to move up and downstream in response to stream conditions such as heat, food availability, and flow strength. *See* Allen Decl. ¶¶ 103-106 [3-ER-0305–06].”). Volitional passage within Gaviota Creek, as distinct from migration, allows SC Steelhead to find summer and fall refuge, shelter, and food—all essential behaviors. 4-ER-0513, 4-ER-0522–23 (Allen); 5-ER-0823–24 (Sandstrom); 7-ER-1248 (NMFS) (stating that “[t]he hot, rain-free summers of southern California <u>require</u> that juvenile *O. mykiss* retreat for the summer to sections of the stream network that do not dry up or overheat too much.”) (emphasis added). The impact on the loss of over-summering habitat on SC Steelhead is well-documented, including by Caltrans:

> Steelhead rely on over-summering habitat as they migrate between freshwater and marine environments. Loss of this habitat could disrupt migration patterns, potentially causing steelhead to seek alternative, less suitable habitats or delaying their migration, which could impact their survival and reproductive success in the watershed.

6-ER-1027 (Caltrans).

### D. Caltrans and the Fish Passage Barriers at Issue.

Gaviota Creek runs immediately adjacent to Highway 101 for approximately three miles, from just north of the Highway 1–Highway 101 intersection to Gaviota State Park at the ocean. *See* 8-ER-1555 (Caltrans) (describing location of Gaviota Creek); 6-ER-1004 (NMFS); 8-ER-1570. Caltrans owns, controls, and maintains Highway 101. 2-ER-0172–73 (Lindt). While constructing Highway 101 along Gaviota Creek, Caltrans built the Grade Control Structures to support the highway. 2-ER-0157, 2-ER-268 (Lindt). The Grade Control Structures at issue in this case from downstream to upstream are referred to as GA_2, GA_3, GA_3.5, GA_6, GA_7, GA_8, GA_9, GA_10, GA_11, GA_12, GA_13, and GA_14.[7] Upstream of GA_14, Caltrans also built and owns two culverts as part of Highway 101: Las Canovas Culvert and the Giorgi Culvert. 2-ER-0216, PFOF 19-20 (stipulated facts).

---

[7] Caltrans did not dispute that it owns all these structures, as well as the Culverts, except for GA_14. The District Court found it "unnecessary to resolve this dispute and … refer[ed] to the utility crossing [GA_14] as if it were a Caltrans-owned barrier." 1-ER-0006, FFCL ¶8 (fact), n. 4.

Two natural barriers exist between GA_6 and GA_7: the Bedrock Chute and the Boulder Jam (collectively, the "Natural Barriers"). *See* 1-ER-0006, FFCL ¶¶ 9-12 (fact); 8-ER-1570.

> 10. The Bedrock Chute is composed of two steep, narrow, smooth slopes with a resting pool in the middle. DeVries Decl. ¶¶ 64-65. The structure of the Bedrock Chute results in high velocity water flow over a narrow shallow surface, which is very difficult for fish to pass. Id.
>
> 11. The Boulder Jam is an eight-foot-high barrier with a bedrock ledge and no plunge pool at the base. Id. ¶ 66. Any fish attempting to go upstream of the Boulder Jam must make a very high jump without the benefit of a pool in which to rest and launch the jump. Id. ¶¶ 66-69.

1-ER-0006, FFCL ¶¶ 10-11 (fact). GA_4 and GA_5 were modified either by natural forces or by Caltrans and are no longer barriers to SC Steelhead passage. 6-ER-1007 (NMFS). Therefore, four Grade Control Structures—GA_2, GA_3, GA_3.5, and GA_6 ("Lower Barriers")—are currently downstream of the Natural Barriers, and eight Grade Control Structures—GA_7 through GA_14 ("Upper Barriers")—are upstream of the Natural Barriers. *See* 1-ER-0006, FFCL ¶ 12 (fact) (citing Trial Ex. 208 [8-ER-1570]).




Trial Exhibit 208

### E. The District Court's Findings of Impacts to SC Steelhead from the Barriers.

The District Court found that the Barriers make it more difficult (if not impossible) for different life stages of SC Steelhead to access portions of Gaviota Creek. 1-ER-0005, FFCL ¶ 7 (fact) (finding Caltrans structures "inhibit free upstream passage of some or all steelhead in Gaviota Creek"); 1-ER-0008, FFCL ¶¶ 22, 26 (fact); *see also* 3-ER-0305, 3-ER-0311–34 (Allen).

Grade Control Structures. The District Court found that the Grade Control Structures did not impact *adult* SC Steelhead. *See* 1-ER-0006–7, FFCL ¶¶ 14-20 (fact). However, the District Court did find that the Grade Control Structures negatively impact the upstream movement of *juvenile* SC Steelhead:

> 22. However, even assuming a two-foot jump height, several Caltrans barriers inhibit upstream movement for juvenile steelhead and resident trout. All but one of the Caltrans barriers inhibit upstream movement if a one-foot jump height is used. See Exhibit 53.
>
> . . .
>
> 25. It is uncontroverted that there is a population of resident trout already existing above the Boulder Jam.
>
> 26. Even if juvenile steelhead and resident trout cannot pass back and forth over the Boulder Jam, the upstream Caltrans barriers prevent fish already above the Boulder Jam from moving upstream above the Boulder Jam.
>
> 27. Juvenile steelhead and resident trout can benefit from being able to move up and downstream in response to stream conditions such as heat, food availability, and flow strength. See Allen Decl. ¶¶ 103-106.

1-ER-0008, FFCL ¶¶ 22, 25-27 (fact).

The District Court's findings were supported by all experts' testimony at trial agreeing that the Grade Control Structures impair the ability of SC Steelhead, especially juveniles, to disperse freely. 3-ER-0346 (Allen); 4-ER-0517–18, 4-ER-0522–23, 4-ER-0530–34, 4-ER-0536–37 (Allen); 5-ER-0824, 5-ER-831–32 (Sandstrom) (testifying that the Grade Control Structures should be removed); 2-ER-0085, 2-ER-0088, 2-ER-0098, 2-ER-0129–30, 2-ER-0133 (Sandstrom); 5-ER-0904 (DeVries) (recognizing the Grade Control Structures "prevent movement of juvenile steelhead" during low flows); 5-ER-0922 (DeVries); 6-ER-1134–35, 6-ER-1144–68.

<u>Culverts</u>. The District Court also found that the Culverts completely block migration and movement for all life cycles of SC Steelhead.

> 35. It is uncontroverted that the two Caltrans culverts are impassable to all adult steelhead, juvenile steelhead, and resident trout.
>
> 36. Therefore, the entire Gaviota Creek watershed upstream of those culverts is inaccessible to adult steelhead and to any juveniles or resident trout not already above the culverts.

1-ER-0009, FFCL ¶¶ 35, 36 (fact). This evidence was undisputed at trial. *See id.*; *see also* 4-ER-0520 (Allen); 5-ER-0759, 5-ER-0824–25, 5-ER-0833 (Sandstrom); 5-ER-0912 (DeVries).

### F. Findings by NMFS and Caltrans Outside of this Litigation.

In regulatory documents assessing the status of SC Steelhead generally, in the Conception Coast BPG, and in Gaviota Creek specifically, NMFS has

identified fish passage barriers as a primary cause of SC Steelhead endangerment. *See, e.g.*, 7-ER-1216, 7-ER-1236 (NMFS). NMFS has made clear that barriers to fish passage are a primary cause of SC Steelhead decline in the Conception Coast BPG (7-ER-1342) and has identified barriers as a "very high threat" to SC Steelhead in Gaviota Creek (7-ER-1341; *see also* 7-ER-1439, 7-ER-1446–47(NMFS) [finding one of four habitat concerns for the BPG]). NMFS, therefore, concluded that removal of these specific Barriers <u>in Gaviota Creek</u> is a top priority action to restore SC Steelhead viability. 7-ER-1442 (NMFS).

Moreover, Caltrans' statements in every instance—except in this litigation—have also identified the Culverts and most of the Grade Control Structures as barriers to SC Steelhead passage. 8-ER-1485–86 (Caltrans); 8-ER-1521–22 (Caltrans); 8-ER-1529–42; 2-ER-0085, 2-ER-0088, 2-ER-0098, 2-ER-0100–02, 2-ER-0104–08 (Sandstrom). Even after this litigation was initiated, Caltrans identified the Grade Control Structures and Barriers as barriers to fish passage barriers to NMFS. *See* 6-ER-1006–08 (Caltrans) (acknowledging suitable habitat for SC Steelhead in Gaviota Creek system, but "several fish passage barriers exist that impede access to rearing and spawning habitat in the upper reaches and tributaries"). At trial, Caltrans showed a map of the hundreds, if not thousands of barriers to fish passage, statewide. 5-ER-0812–13 (Sandstrom); 8-ER-1567–68. Out of all these barriers, Caltrans identified almost all the Barriers in Gaviota

Creek as priorities for remediation. 2-ER-0223–24, PFOF 59-74 (stipulated facts). The purpose of the remediation of the Barriers is because Caltrans found it is necessary for SC Steelhead to access important habitat. *See* 8-ER-1560 (Caltrans) (without remediation, "fish passage barriers would remain in their existing condition, *preventing* endangered steelhead from using their critical habitat.") (emphasis added); *see also* 8-ER-1557 (Caltrans) (removing Lower Barriers to "increase access to habitat that supports spawning, rearing, and migration for steelhead"); *see also* 6-ER-1009 (Caltrans).

## SUMMARY OF THE ARGUMENT

The District Court made three categories of errors, which should be reversed:

<u>Section I</u>. The District Court applied the wrong legal standard for determining whether take has occurred. *First*, the District Court erred when it required Appellant to prove harm to the population of SC Steelhead in Gaviota Creek, or to the species as a whole, to demonstrate take under ESA section 9. *See* Argument, Section I.B. *Second*, the District Court also erred by requiring proof that the habitat blocked by the Barriers is essential to the species to demonstrate take. *See* Argument, Section I.C. Both requirements have been specifically rejected by the Ninth Circuit. *See* Argument, Section I.B-C. If the District Court had properly applied the well-established standard for demonstrating harm that

constitutes take, the District Court should have found take occurred as a matter of law, based on its own factual findings. *See* Argument, Section I.D. Therefore, as a matter of law, the District Court erred by finding that Caltrans' Barriers do not cause take of SC Steelhead.

Section II. The District Court also committed clear error in its factual findings in at least two ways. *First*, the District Court failed to consider probative evidence that both NMFS and Caltrans have repeatedly found that the Barriers not only harm individual SC Steelhead, but are the biggest threat to SC Steelhead in the watershed and block access to critical habitat. By failing to consider and address this contrary evidence, the District Court's factual findings to the contrary are clear error. *See* Argument, Section II.B.1. *Second*, despite the fact that the District Court found that the Culverts completely block access for SC Steelhead to upstream habitat, it found that this did not constitute harm because the District Court found that the upstream habitat was not high quality or necessary for SC Steelhead. As stated above, this is not the standard a plaintiff needs to meet, but in any case, this factual finding regarding the upstream habitat is not supported by any properly admissible evidence in the record. Even considering Appellee's evidence in the best light, Appellee only presented evidence about a small portion of the habitat and only opined as to its value for spawning, not for any other essential behavior, such as sheltering or refuge. Thus, the District Court's

determination that the upstream habitat would not benefit SC Steelhead is not supported by evidence and is clear error. *See* Argument, Section II.B.2.

Section III. Finally, the District Court abused its discretion when it admitted undisclosed expert testimony by Caltrans' expert, Dr. Paul DeVries. At trial, Dr. DeVries offered previously undisclosed opinion and analysis that the habitat above the Culverts was not good habitat for SC Steelhead spawning purposes. As discussed above in Section II, the District Court made the same finding and, on that basis, found that Coastal Ranches had not met its burden to demonstrate the Culverts harm SC Steelhead. Because admission of the undisclosed expert testimony was neither substantially justified nor harmless, the District Court should have excluded this evidence. Fed. R. Civ. Proc. 37(c)(1). As a result, the District Court abused its discretion and committed reversible error.

For each of these reasons, the Ninth Circuit should reverse the District Court's judgment. The District Court's findings of fact are sufficient for this Court to find that the Barriers harm and, thus, take SC Steelhead, in violation of ESA section 9, 16 U.S.C. § 1538(a)(1)(B). Thus, it is appropriate for this Court to make that legal finding and remand to the District Court to find Appellee liable for violating section 9 and to issue an appropriate remedy. Alternatively, the District Court decision should be reserved because of the clearly erroneous factual findings and error in admitting undisclosed expert testimony.

# ARGUMENT

## I. THE DISTRICT COURT ERRED AS A MATTER OF LAW BY FAILING TO FIND THAT THE BARRIERS CAUSE HARM.

### A. Standard of Review.

Misconstruing what harm constitutes take, the District Court erred as a matter of law by requiring Coastal Ranches (1) to show harm to the population of SC Steelhead, rather than individuals, and (2) to demonstrate that the habitat degraded by Caltrans was essential to the species. The District Court's use of a legal standard is reviewed de novo. *See Cascadia Wildlands*, 105 F.4th at1156 (citing *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993)).

### B. The District Court Improperly Required a Population-Level Impact to Prove Harm.

First, the District Court improperly found that Coastal Ranches did not adequately demonstrate the Barriers' impacts to the SC Steelhead population as a whole. *See* 1-ER-0011–13, FFCL ¶¶ 6-9 (law). The District Court provided no standard for what constitutes a "meaningful" or "substantial" effect to the <u>population</u> of SC Steelhead, rather than to individuals, because no such standard exists under the law. 1-ER-0008–9, FFCL ¶¶ 28, 32, 37 (fact).

> 28. However, Appellant provided insufficient evidence for the Court to conclude that the benefit to juvenile steelhead and resident trout of being able to move upstream over the non-culvert barriers translates into an actual *meaningful impact to the steelhead population*. . . .
>
> 32. In the absence of this type of evidence, the Court is left with no way to conclude that movement of O. mykiss within the areas impeded by the Caltrans barriers would have an actual, *substantial*

> *impact on the population*. . . .
>
> 37. However, there is little evidence from which to conclude that access to the habitat upstream of the culverts would have a *meaningful impact on the steelhead population*.

*Id*. (emphasis added). The District Court then relied on these findings to conclude that Coastal Ranches had not met its burden. *See, generally,* 1-ER-0011–13, FFCL ¶¶ 6-9 (law); *see* 1-ER-0012, FFCL ¶ 6.d (law) ("[Appellant] failed to establish that lack of access to the habitat upstream of the culverts significantly impairs *the steelhead population* in Gaviota Creek or in Southern California more generally.") (emphasis added). Thus, the District Court required that Appellant show a population-level effect to demonstrate take. This interpretation contradicts the statute and Ninth Circuit precedent, and constitutes legal error requiring reversal.

ESA section 9 makes it "unlawful for any person . . . to . . . take any such [endangered] species." 16 U.S.C § 1538(a)(1)(B). The statutory definition of "'take' means to harm, harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *see* S. Rep. No. 93-307 at 7 (1973) ("take" is to be interpreted broadly to include "every conceivable way in which a person can 'take' wildlife"). At no point do these statutory provisions require an impact to the population of an endangered species. For example, section 9 clearly prohibits the killing of an individual endangered species—it would not require a showing of killing of a sufficient number to cause a "substantial impact" on the species population to prove a section 9 violation. The

same is true for harm; the statute simply does not require a demonstration that there is harm to a population. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 711 (1995) ("*Sweet Home*") (O'Connor concurrence) (recognizing that "the Service makes clear that section 9's threshold does focus on individual members of a protected species." [quotation/citation omitted]).

Ninth Circuit precedent aligns with this statutory reading. "To prove take, the Ninth Circuit has repeatedly held that "a citizen-suit plaintiff must prove . . . injury to *identifiable members* of the protected species . . .." *Cascadia Wildlands,* 105 F.4th at 1156 (emphasis added); *see also Nat'l Wildlife Fed'n*, 886 F.3d at 818 ("The ESA accomplishes its purpose in incremental steps, which include protecting the remaining members of a species.") (citation omitted).

> The ESA's purpose of conserving endangered species allows for broad protections for those species—the ESA itself forbids the take of any member of an endangered species. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704, 115 S. Ct. 2407, 132 L. Ed. 2d 597 (1995) (finding Congress intended "take" to be defined "in the broadest possible manner to include every conceivable way in which a person can "take" or attempt to "take" any fish or wildlife." (quoting S. Rep. No. 93-307, p. 7 (1973))); *Nat. Res. Council v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007) (finding Section 9 of the ESA "issues a blanket prohibition on the taking of any member of a listed species."); *see also, Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621, 624 (9th Cir. 2017) ("In its approach to evaluating irreparable harm, the district court correctly required harm to Cascadia's interest in individual members of the marbled murrelet species as opposed to harm to the entire species itself.").

*White v. United States Army Corps of Eng'rs*, No. 3:22-cv-06143, 2023 U.S. Dist. LEXIS 190274, ** 26-27. (N.D. Cal. Oct. 23, 2023); *see also Nat'l Wildlife Fed'n*, 886 F.3d at 818; *Oregon Nat. Res. Council*, 476 F.3d at 1040; *Wishtoyo Found.*, 2018 U.S. Dist. LEXIS 174505, **204-206. The focus of a take claim is, thus, on individual members, not the population, as the District Court required.

If Congress wanted to limit violations of ESA section 9 to those situations where the take caused a population-level impact, it could have done so. Indeed, the "jeopardy analysis" under ESA section 7 does just that. Section 7 states that:

> [e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical. . . .

16 U.S.C. § 1536(a)(2). The jeopardy analysis under section 7 requires a population-level impact. See 50 C.F.R. § 402.02 (jeopardy means "to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species"). Take often does occur and can be permitted under section 7 when the population of a species is not jeopardized. *See* 16 U.S.C. §§ 1536(b)(4) (providing for permit allowing for incidental take), 1536(o)(2) (excusing take occurring in compliance with an incidental take statement issued under section 7). By requiring a showing that Caltrans' Barriers cause a "substantial impact" to the SC Steelhead population,

the District Court improperly applied the equivalent of a section 7 jeopardy analysis, improperly increasing the burden to establish take under section 9.

### C. The District Court Erred by Requiring Appellant Demonstrate the Upstream Habitat Blocked by the Barriers Was Essential.

Second, the District Court incorrectly required Coastal Ranches to demonstrate that the habitat modified was essential to the species to demonstrate harm. The District Court made factual findings applying this standard:

> 34. [Appellant] has failed to establish that Gaviota Lagoon and the interrupted stretches of Gaviota Creek downstream of the culverts *fail to provide sufficient amounts of reasonably high quality habitat for resident trout and juvenile steelhead*, especially given the very low number of steelhead currently in Gaviota Creek or likely to be resident in Gaviota Creek in the foreseeable future.[8]
>
> 39. There is some evidence that Las Canovas Creek upstream of the Las Canovas Culvert contains potentially good steelhead and resident trout habitat. See Allen Decl. ¶¶ 58-60. However, [Appellant] submitted very little evidence on this point, and *the Court cannot conclude that access to the creek would provide a meaningful benefit to the steelhead population*.
>
> 44. The Court accepts that access to the West Fork could be marginally helpful to the O. mykiss population, all other things being equal, but *it is not convinced that access would make a significant difference to that population*.

[8] The fact that the Court doubted that the SC Steelhead in Gaviota Creek needed more than the Gaviota Lagoon *because* SC Steelhead are found in such low numbers in the watershed is bizarre at best. The standard apparently applied by the Court would mean that virtual extirpation of SC Steelhead in Gaviota Creek reduces habitat needs to virtually zero—an outcome that would prevent recovery and is clearly inconsistent with the ESA.

1-ER-0009–10, FFCL ¶¶ 34, 39, 44 (fact) (emphasis added). The District Court then based its conclusions that Appellant did not meet its burden to demonstrate take on these factual findings. *See* 1-ER-0011–13, FFCL ¶¶ 6-9 (law).

ESA section 9 does not require Coastal Ranches demonstrate that SC Steelhead cannot survive in other areas to prove that the Barriers "take" SC Steelhead in Gaviota Creek. *See Or. Natural Res. Council,* 476 F.3d at 1033, 1040; *Nat'l Wildlife Fed'n,* 886 F.3d at 818; *Marbled Murrelet*, 83 F.3d at 1067; *Cnty. of San Luis Obispo*, 758 F. Supp. 3d at 1160, 1164. In *Cascadia Wildlands*, the Ninth Circuit specifically rejected an additional layer of scrutiny for take that would have considered whether the impacted habitat was "essential" for protection of the species, reasoning that "[w]e decline to rewrite the statute to narrow this already circumscribed approach." *See Cascadia Wildlands*, 105 F.4th at 1157. While the District Court cites this standard, 1-ER-0011, FFCL ¶ 5 (law), it is clear the District Court found Appellant's evidence lacking because it did not show that *the population* could not survive without the blocked habitat. Accordingly, the District Court applied the wrong legal standard.

In short, the elements of take resulting from habitat modification do not require or permit consideration of effects to the population as a whole or require a demonstration that habitat is necessary or essential. Coastal Ranches was only required to show that Caltrans' actions resulted in the take of a single individual.

The District Court erred, as a matter of law, by considering these extra-regulatory factors.

### D. The District Court's Factual Findings Are Sufficient to Demonstrate Harm under the Regulatory Definition in Place at the Time of the Violations.

Although the District Court did not find that the Barriers resulted in take (because the Court applied the wrong legal standard), the District Court made factual findings sufficient to demonstrate harm and, thus, take under existing law. Harm includes "significant habitat modification or degradation which actually kills or injures fish or wildlife *by significantly impairing essential behavioral patterns.*" 50 C.F.R. 222.102 (emphasis added). Evidence supporting a finding that habitat modification significantly impairs an essential species behavior is sufficient to demonstrate harm. *See Cascadia Wildlands*, 105 F. 4th at 1156; *Marbled Murrelet*, 83 F.3d at 1067-68 (evidence is sufficient where a plaintiff shows that a defendant's conduct "*would likely harm*" the endangered species "by impairing their breeding and increasing the likelihood of attack by predators.") (emphasis added). The fact that habitat modification causes harm and take of species is supported by the fact that the preservation of habitat to protect endangered species is a primary driver for the ESA. *See* 16 U.S.C. § 1531(a)(1) (recognizing that species "have been rendered extinct as a consequence of economic growth and development"); *see also* 16 U.S.C. § 1531(b) (a purpose of the ESA is "to provide

a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved"). Indeed, the Supreme Court has recognized that "an ordinary understanding of the word 'harm'" includes significant habitat modification, which significantly impairs essential life behaviors. *Sweet Home*, 515 U.S. at 697.

The Ninth Circuit has summarized the legal standard for habitat modification to qualify as take, as follows:

> [T]he ESA and its regulations . . . require that a habitat be *used* by members of a protected species, that the habitat be *significantly* modified or degraded, and that the modification or degradation *significantly* impair the species' *essential* behavioral patterns.

*Cascadia Wildlands,* 105 F. 4th at 1157 (emphasis original).

There is no doubt that Gaviota Creek is "*used* by members of a protected species." *Id.*; *see, e.g.,* 1-ER-0008, FFCL ¶¶ 5, 25 (fact); 1-ER-0011, FFCL ¶¶ 1, 5 (law). All the habitat below the Giorgi Culvert is designated as critical habitat. 2-ER-0229, PFOF 97 (stipulated fact). Although the Court found the *quality* of the habitat above the Giorgi Culvert uncertain (1-ER-0010, FFCL ¶ 38 (fact)), that was not a required element, and it was undisputed that this habitat has been historically used by SC Steelhead (*see, e.g.,* 4-ER-0518–19, 4-ER-0522, 4-ER-0562–63 [Allen]; 5-ER-0781, 5-ER-0799, 5-ER-0841–42 [Sandstrom]; 4-ER-0455–57 [Campbell]).

As explained below, the Culverts and Grade Control structures significantly modify SC Steelhead habitat and significantly impair essential life behaviors.

1. <u>Courts have consistently found that simply blocking access to historic habitat, as the Culverts do in this case, qualifies as harm and take.</u>

The District Court's factual findings related to the Culverts are sufficient to demonstrate that the Culverts significantly modify SC Steelhead habitat and impair the species' essential behavioral patterns, including migration. The District Court found that the Culverts blocked all access to upstream habitat for adults, juveniles, and resident trout. 1-ER-0009, FFCL ¶ 35 (fact) ("uncontroverted that the two Caltrans culverts are impassable . . .."). "Therefore, the entire Gaviota Creek watershed upstream of those culverts is inaccessible to adult steelhead and to any juveniles or resident trout not already above the culverts." 1-ER-0009, FFCL ¶ 36 (fact).[9] Likewise, any juvenile SC Steelhead spawned above the Culverts (by resident trout) are unable to access downstream habitat, thereby preventing those individuals from expressing their anadromous life form by migrating from their spawning grounds to the ocean because of the Culverts. *See* 1-ER-0009, FFCL ¶ 35 (fact); 3-ER-0293–94 (Allen) (*O. mykiss* currently observed above Giorgi Culvert); 4-ER-0520–21 (Allen). Approximately half of the available Steelhead habitat in

[9] At trial, there was evidence that SC Steelhead have been stranded in a drying pool below Giorgi Culvert, unable to escape through the culvert. 6-ER-0972–73 (NMFS); 4-ER-0447–48, 454–55 (Campbell).

Gaviota Creek is above the Giorgi Culvert. 4-ER-0518–19 (Allen) (2.5 miles of habitat above Giorgi Culvert); 5-ER-0781 (Sandstrom) (Gaviota Creek is 5-6 miles); *see also* 6-ER-1081. These facts are sufficient to demonstrate harm because the Culverts completely block both volitional passage and migration, two essential life behaviors. *See* 1-ER-0009, FFCL ¶¶ 35-36 (fact). As a result, other essential life behaviors are also diminished, such as rearing, spawning, and sheltering.

Courts have consistently held that blocking access to habitat for individual members of a listed species constitutes harm and take. *See, e.g., Wishtoyo Found.*, 2018 U.S. Dist. LEXIS 174505, **6-7, 185-88; *see also Cnty. of San Luis Obispo*, 758 F. Supp. 3d at 1160, 1164-1167; *Sierra Club & S.C. Wildlife Fed'n v. Kolnitz*, No. 2:16-cv-03815-DCN, 2017 U.S. Dist. LEXIS 128462, *15-18 (D.S.C. Aug. 14, 2017) (agreeing with agency determinations that sea walls blocked sea turtles from accessing and nesting on sections of beach and thus finding take); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Raimondo*, No. 1:20-cv-00431-DAD-EPG, 2022 U.S. Dist. LEXIS 44155, *16-21 (E.D. Cal. Mar. 11, 2022). For example, in *Wishtoyo Foundation*, the Central District of California found that a dam that made upstream passage harder for migrating adults constituted harm, because it "prevent[ed] adult Steelhead from engaging in the [sic] their essential breeding behaviors upstream [of the dam]." *Wishtoyo Found.*, 2018 U.S. Dist. LEXIS 174505, **6, 185-88. In this case, the Culverts not only impair upstream passage,

but completely block all passage, preventing any juvenile or adult Steelhead from moving upstream or downstream to migrate, breed, feed, or find refuge.

2. The District Court's findings that the Grade Control Structures impair movement of juvenile Steelhead in critical habitat also constitutes take.

The District Court's factual findings also demonstrate that the Grade Control Structures significantly modify SC Steelhead and impair essential life behaviors, namely volitional movement for juveniles. The District Court recognized that juvenile Steelhead "move up and downstream in response to stream conditions such as heat, food availability, and flow strength." 1-ER-0008, FFCL ¶ 27 (fact). Thus, moving within the Creek is an essential life behavior. *See id.*; *see also* 7-ER-1248 (NMFS) (stating that "[t]he hot, rain-free summers of southern California require that juvenile *O. mykiss* retreat for the summer to sections of the stream network that do not dry up or overheat too much.") (emphasis added). "[A] habitat modification which significantly impairs the . . . sheltering of a protected species amounts to 'harm' under the ESA." *Marbled Murrelet,* 83 F.3d at 1067, referring to *Sweet Home*, 515 U.S. 687.

The District Court found that the Grade Control Structures prevent juvenile Steelhead from moving within Gaviota Creek. *See* 1-ER-0008, FFCL ¶ 22 (fact). The District Court found that "the upstream Caltrans barriers [GA_7 through GA_14] prevent fish already above the Boulder Jam from moving upstream above

the Boulder Jam." 1-ER-0008, FFCL ¶ 26 (fact). The District Court applied both a one-foot and two-foot height standard to determine whether the Grade Control Structures "inhibit upstream movement." 1-ER-0008, FFCL ¶ 22 (fact).

> 22. However, even assuming a two-foot jump height, several Caltrans barriers inhibit upstream movement for juvenile steelhead and resident trout. All but one of the Caltrans barriers *inhibit upstream movement* if a one-foot jump height is used. See Exhibit 53.

*Id*. (emphasis added). Assuming the most conservative reading of the facts (2-feet), GA_2, GA_3, GA_6, GA_7, GA_8, GA_10, GA_12, and GA_13 impair juvenile SC Steelhead movement, according to the District Court's findings. 6-ER-1083.[10]

Importantly, the habitat downstream of the Giorgi Culvert is all designated as critical habitat, meaning NMFS has found it to be "essential for the conservation" of SC Steelhead. 16 U.S.C. § 1532(5); *see* NMFS, Endangered and Threatened Species; Designation of Critical Habitat for Seven Evolutionary Significant Units of Pacific Salmon and Steelhead in California, 70 Fed. Reg. 52488, 52491 (Sept. 2, 2005) (confirming all designated areas are essential to the species); *id*. at 52580 (designating Gaviota Creek). Critical habitat by definition supports essential life behaviors. *See* 70 Fed. Reg. at 52492 (affirming that, in designating critical habitat, NMFS "identified the features of the habitat that are

[10] At trial, Caltrans did not dispute the heights of the Grade Control Structures. And the District Court relied on these heights to determine the likelihood that the Grade Control structures impaired movement. 1-ER-0008, FFCL ¶ 22 (fact).

essential for the species to complete each life stage and are therefore essential to its conservation”); *see, e.g., Cnty. of San Luis Obispo*, 758 F. Supp. 3d at 1159 (“Critical habitat supports one or more life stages (migration, spawning, rearing, and estuarine acclimation) and contains physical or biological features essential to the survival, growth, and reproduction of the species.” [internal quotation, citation omitted]). Thus, significant modification of critical habitat, such as by the Grade Control Structures in Gaviota Creek, impair essential life behaviors. The seven Grade Control Structures, which the District Court acknowledged impair the volitional movement of juvenile Steelhead, *see* 1-ER-0008, FFCL ¶¶ 22, 27 (fact), are located within approximately one mile of critical habitat, *see* 6-ER-1104–09; 6-ER-1083; 8-ER-1570. By limiting movement, the Grade Control Structures significantly impact the ability of Steelhead to undertake essential life behaviors in this area and, thus, constitute take.

In short, the District Court’s factual findings are sufficient to find that the two Culverts and at least seven Grade Control Structures cause harm, because they significantly impact essential life behaviors of individual SC Steelhead in Gaviota Creek.

## II. THE COURT'S FACTUAL FINDINGS REGARDING IMPACTS TO STEELHEAD FROM THE BARRIERS WERE CLEAR ERROR.

### A. Standard of Review.

The Court should overturn the District Court's factual findings if they are clearly erroneous. *Cascadia Wildlands,* 105 F.4th at 1156, citing *Mt. Graham Red Squirrel*, 986 F.2d at 1571. A finding of fact is "clearly erroneous if it is implausible in light of the record, viewed in its entirety, or the record contains no evidence to support it." *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 597 (9th Cir. 2025) (citation omitted). "[T]he Supreme Court has held that 'a finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009); *see also Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 798 (9th Cir. 2005) (clear error occurs when "discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found").

### B. The District Court Clearly Erred by Ignoring Highly Probative Evidence by NMFS and Caltrans Demonstrating that the Barriers Harm SC Steelhead.

As stated above in Argument, Section I, this Court should review the District Court's conclusions as to whether the Barriers cause "harm," as defined by 50 C.F.R. § 222.102, and, thus, "take," de novo as they are legal conclusions.

*Cascadia Wildlands,* 105 F.4th at 1156, citing *Mt. Graham Red Squirrel*, 986 F.2d at 1571. However, if the Court considers these to be factual findings, they are clearly erroneous because they cannot be reconciled with the record as a whole.

The District Court's conclusion that the Barriers do not harm SC Steelhead populations depends on factual findings that are contradicted by key evidence the Court completely ignored, specifically NMFS' findings and Caltrans' non-litigation, official statements finding the Barriers are harmful to SC Steelhead. *Id*.

First, the District Court failed to consider any findings by NMFS. NMFS has repeatedly identified the barriers to passage generally and the Caltrans Barriers in Gaviota Creek specifically has a major threat to endangered SC Steelhead. In the Recovery Plan for SC Steelhead published in January 2012, NMFS analyzed the status of SC Steelhead and species habitat in the Conception Coast BPG and identified recovery action items to protect the species from extinction. *See* 7-ER-1332–83 (NMFS); *see also* 7-ER-1204 (NMFS) ("Recovery Plans identify recovery actions, based upon the best scientific and commercial data available, necessary for the protection and recovery of listed species."). NMFS found that "[c]ulverts and road crossings (along with other fish passage barriers such as small dams) are widespread throughout the Conception Coast BPG region, cutting off or severely reducing access to upstream spawning and rearing habitats for anadromous *O. mykiss*." 7-ER-1342 (NMFS). For Gaviota Creek specifically,

NMFS identified road and passage barriers as "very high threats" and removal or modification of fish passage barriers as a key recovery action. 7-ER-1341, 7-ER-1353 (NMFS).

In the latest 5-Year Review for SC Steelhead from 2023, NMFS found that "[f]ish passage improvements are needed to remedy both partial and complete barriers to migration and reach-scale movement of adult and juvenile steelhead." 7-ER-1446 (NMFS). NMFS identified five "High Priority Habitat Actions;" the first of which was to:

> Identify and remove or modify man-made steelhead passage impediments (*e.g.*, road crossings, water diversions, flood control structures) in core recovery population watersheds to promote the volitional movement of adult and juvenile *O. mykiss*.

7-ER-1446–47 (NMFS). Specific to Gaviota Creek, NMFS identified fish passage impediments from Highway 101 as a "Population-Specific Key Emergent... Habitat Concern." 7-ER-1434 (NMFS).

> The primary population-specific areas of habitat concern for the Conception Coast BPG are:
>
> • ***Gaviota Creek,*** *El Capitan Creek, Goleta Slough Complex, Mission Creek, Toro Creek, Rincon Creek*: **Impediments to fish passage** from road crossings, flood control structures, dams and diversions that restrict steelhead access to high quality spawning and rearing habitat, including refugia habitat, for anadromous and resident *O. mykiss*. See, for example, Capelli (2018c, 2021), Loaiciga and Booth (2021).

7-ER-1438 (NMFS) (emphasis added). NMFS, therefore, recommended "[c]ompletion of studies and implementation fish passage project for CalTrans

(sic) U.S. Highway 101 grade-control structures on Gaviota Creek" in the next five years. 7-ER-1442 (NMFS).

The District Court's complete failure to consider this evidence is clear error. Courts regularly rely heavily on NMFS' findings when evaluating harm. *See, e.g., San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 594-96 (9th Cir. 2025); *see Cnty. of San Luis Obispo*, 758 F. Supp. 3d at 1164-67; *Nw. Envtl. Def. Ctr. v. United States Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1297-1299 (D. Or. 2011). Again, the District Court never explained why it did not rely on NMFS' findings that, if considered, would materially alter the District Court's conclusions.

Second, the District Court entirely ignored contradictions in Caltrans' litigation position and its position outside of this litigation that bear directly on the District Court's conclusion that the Barriers do not harm SC Steelhead. Caltrans has identified both Culverts and most of the Grade Control Structures as barriers to SC Steelhead passage for many years. 8-ER-1485–86 (Caltrans); 8-ER-1521–22 (Caltrans); 5-ER-0824–25 (Sandstrom). Caltrans' representative, Sarah Sandstrom, testified that Caltrans has determined that GA_2, GA_3, GA_6, GA_7, GA_8, GA_10, GA_11, GA_12, and GA_13 are at least partial passage barriers to SC Steelhead, and the Culverts are complete barriers to all Steelhead life stages. 2-ER-0085, 2-ER-0088, 2-ER-0098, 2-ER-0100–02, 2-ER-0104–08 (Sandstrom); 5-ER-

0824–25 (Sandstrom). Caltrans has stated in official documents submitted to the California legislature under State law and under oath that these structures impede the movement of SC Steelhead in Gaviota Creek. *See* 8-ER-1450–1527 (Caltrans); 2-ER-0073 (Sandstrom) (defining a fish passage barrier), 2-ER-0085, 2-ER-0088, 2-ER-0098, 2-ER-0100–02, 2-ER-0104–08; 5-ER-0824–25 (Sandstrom); *see also* Cal. Sts. & Hy. Code § 156(a) ("'Fish passage' means the ability of an anadromous fish to access appropriate habitat at all points in its life cycle, including spawning and rearing."). Therefore, Caltrans has admitted that the Barriers impair Steelhead's essential behaviors, including volitional movement and migration.

Not only has Caltrans identified the Barriers as structures that harm Steelhead, but Caltrans has identified the Gaviota Creek Barriers as Statewide priorities for remediation, based on their importance to the recovery of SC Steelhead. *See* 2-ER-0223–24, PFOF 59-74 (stipulated facts); 8-ER-1485–86 (Caltrans); 8-ER-1521–22 (Caltrans); 8-ER-1529–42; 5-ER-0825–26, 5-ER-0828 (Sandstrom). Out of thousands of barriers statewide, Caltrans prioritized nine Barriers in Gaviota Creek for remediation, demonstrating Caltrans' determination that these are key barriers to fish passage that require removal. 5-ER-0812–13, 5-ER-0817, 5-ER-0828 (Sandstrom); 2-ER-0119–20 (Sandstrom); 8-ER-1567 (map showing thousands of barriers in State). Caltrans justifies proposed remediation of the Gaviota Creek Barriers on the basis that the Barriers prevent SC Steelhead

from accessing 28.37 miles of upstream habitat that "supports spawning, rearing, and migration," some of which is designated critical habitat because of these Barriers. 8-ER-1556–57, 8-ER-1560 (Caltrans) (without remediation, "fish passage barriers would remain in their existing condition, preventing endangered steelhead from using their critical habitat."); 8-ER-1550 (Caltrans).

Caltrans' position in this litigation that the Barriers do not harm SC Steelhead or that remediation of the Barriers would make no difference to the species directly contradict these official statements. Yet, the District Court completely ignored these obvious contradictions, which renders the factual findings unsupported by the record. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (finding agency decision deficient where it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" [internal quotation, citation omitted]).

Moreover, the District Court's own factual findings further solidify inconsistencies and illogical gaps in the Court's reasoning. For example, the District Court found the Barriers do not impair the essential behavior patterns of SC Steelhead, yet it never addressed or defined what those essential behaviors are outside of saying that the populations "can benefit from being able to move up and

downstream…." *See* 1-ER-0008, FFCL ¶ 27 (fact). Again, this directly contradicts NMFS's findings and Caltrans' position regarding the Barriers.

In sum, the District Court's conclusion and underlying findings that the Barriers do not "meaningfully" impact SC Steelhead are illogical and implausible in light of the entire record and fail to "give the appellate court a clear understanding of the basis of the trial court's decision." *Hinkson*, 585 F.3d at 1260 ("finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed").

### C. The District Court's Determination that Habitat Above the Culverts Was Not High Quality or Significant to SC Steelhead Was Not Supported by the Record.

As explained in Argument, Section I.C, Coastal Ranches need not demonstrate that the historic habitat upstream of the Culverts is necessary or even of high quality to establish take. However, to the extent the Ninth Circuit finds this quality of the upstream habitat is material, it should find the District Court erred when it could not "conclude that access to the creek would provide a meaningful benefit to the steelhead population." 1-ER-0010, FFCL ¶¶ 38, 39 (fact). This finding is implausible in light of the complete record.

The evidence that the habitat upstream of the complete passage barriers at Giorgi and Las Canovas Culverts is high quality was uncontroverted by properly

admissible evidence at trial. Coastal Ranches' expert, Mark Allen, relied on the observations and analysis of watershed conditions conducted in 2002 (referred to as "Stoecker 2002"). *See, e.g.*, 3-ER-0293–94 (Allen); 4-ER-0518–19, 4-ER-0562–63 (Allen). Mr. Allen also relied on more recent observations and personal communications with the landowner of the area above Giorgi Culvert, as well as personal observations in Las Canovas Creek. 3-ER-0293-97, 3-ER-0332–33 (Allen); 4-ER-0520–22, 4-ER-0526 (Allen); *see also* 4-ER-0455–57 (Campbell) (observations of good habitat, consistent with Stoecker 2002).

Testimony proffered by Caltrans did not contradict these findings. Indeed, Caltrans' expert, Sarah Sandstrom, relied on the habitat assessment in Stoecker 2002, affirming its reliability. 5-ER-0799, 5-ER-0841 (Sandstrom). While Ms. Sandstrom testified that some habitat upstream of the Giorgi Culvert is compromised, she admitted she only observed 500-600 feet out of 2.5 miles of habitat above Giorgi Culvert. 5-ER-0842 (Sandstrom). She provided no evidence to support finding that the remaining habitat upstream is not high quality. 5-ER-0842 (Sandstrom) (admitting she can only speak to the quality of the habitat that she has seen), 5-ER-0853 (not aware of any development above Giorgi Culvert since 2002).

Caltrans' other expert, Dr. Paul DeVries, testified that the creeks upstream of the Culverts are not good spawning habitat. 5-ER-0913–14 (DeVries). However,

this evidence should not have been admitted, as it was completed only weeks before trial and was not previously disclosed. 5-ER-0914 (DeVries); Fed. R. Civ. Proc. 37(c)(1).[11] Even if this opinion is considered, Dr. DeVries' new analysis is limited to spawning—and it is undisputed that the creeks upstream of the Culverts provide other habitat values (specifically dense riparian vegetation and deep spring-fed cool water pools)—central to essential life behaviors of SC Steelhead. 4-ER-0519, 4-ER-0547, 4-ER-0552 (Allen); 3-ER-0290, 3-ER-0293–96 (Allen).

While the District Court was entitled to determine what weight to give evidence, it was not entitled to reach a factual finding that is not supported by any evidence in the record. *See San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 597 (9th Cir. 2025), citing *Nat'l Wildlife Fed'n*, 422 F.3d at 794 (findings are clearly erroneous where they are implausible considering the entire record). Caltrans' evidence regarding the habitat above the Culverts was limited to only a small portion of the area and to one use, spawning. No evidence supports finding that the areas above the Culverts were not usable, quality habitat for SC Steelhead. Thus, the Court should find that the District Court's findings to the contrary constitute clear error.

---

[11] The District Court's admission of this evidence was an abuse of discretion. *See* Argument, Section III, below.

## III. THE DISTRICT COURT'S CONSIDERATION OF UNDISCLOSED EXPERT TESTIMONY IS REVERSIBLE ERROR.

### A. Standard of Review

The Supreme Court has "held that abuse of discretion is the proper standard of review of a district court's evidentiary rulings." *GE v. Joiner*, 522 U.S. 136, 141-42 (1997), citing *Old Chief v. United States*, 519 U.S. 172, 174, n.1 (1997), *United States v. Abel*, 469 U.S. 45, 54 (1984). "To reverse on the basis of an erroneous evidentiary ruling, the court must conclude both that the district court abused its discretion in its decision and also that the error was prejudicial." *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs.*, 743 F. App'x 771, 775 (9th Cir. 2018), citing *Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013).

### B. The District Court Abused Its Discretion When It Failed to Exclude Undisclosed Expert Testimony as Required by Federal Rule of Civil Procedure 37(c)(1).

At trial, Caltrans' expert, Dr. DeVries, offered new opinions and detailed analysis regarding the quality and amount of spawning habitat above the Culverts. *See* 5-ER-0880–82 (DeVries). Yet, in his expert report, Dr. DeVries offers no opinions about the quality of habitat upstream of the Culverts. *See* 3-ER-0358–59 (DeVries). Further, this information was not presented by Dr. DeVries before trial in his written testimony. *See, generally*, 2-ER-0242 (DeVries). Instead, Caltrans waited until trial to submit any opinion by Dr. DeVries regarding the quality of habitat upstream of the Culverts.

On cross, Coastal Ranches' counsel asked when Dr. DeVries did this analysis, and Dr. DeVries stated "within the last couple weeks" and further admitted that Caltrans had not shared those calculations with Appellant. 5-ER-0914–15. At that point, Coastal Ranches' counsel objected to this previously undisclosed testimony. 5-ER-0915. The District Court simply told counsel to move on and stated that Dr. DeVries had not testified about this information until Coastal Ranches' counsel asked, which was clearly incorrect since the testimony had been discussed in detail on direct. *See id.*; 5-ER-0880–82 (DeVries).

The District Court abused its discretion by accepting the undisclosed expert analysis and opinion. Federal Rule of Civil Procedure 37(c)(1) prohibits the use of undisclosed expert opinion at trial, "unless the failure was substantially justified or is harmless." Neither is the case here. Dr. DeVries could have conducted his analysis regarding the spawning habitat upstream of the Culverts at any time prior to expert disclosures or at least before trial, but instead Caltrans chose not to disclose the analysis or opinions until trial. Such delay is neither justified nor harmless. *Compare Alliance Communs. Techs., Inc. v. AT&T Corp.*, 245 Fed. Appx. 583, 585 (9th Cir. 2007) (finding violation of Rule 26 was harmless because plaintiff "had many months to review contested information before trial and was granted leeway by district court in cross-examining about contested testimony").

Thus, under Federal Rule of Civil Procedure 37(c)(1), the evidence was required to be excluded, and the District Court's failure to do so was an abuse of discretion.

Even if the District Court had discretion to allow the new opinion testimony at trial, the District Court still abused its discretion by failing to consider the objection and "conduct requisite analysis." *Petrone v. Werner Enters.*, 42 F.4th 962, 968 (8th Cir. 2022) ("[T]he district court did not conduct *any* analysis under Rule 37(c)(1) and instead simply granted judgment in favor of Defendants. The district court's failure to conduct this analysis amounts to a failure to exercise its discretion, which is an abuse of discretion."), citing *Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882, 889 (7th Cir. 2020) and *Islamic Inv. Co. of the Gulf (Bahamas) Ltd. v. Harper (In re Grand Jury Investigation)*, 545 F.3d 21, 25 (1st Cir. 2008). Here, the District Court did not even consider Coastal Ranches' objection, did not assess whether the opinion was previously disclosed, or whether its late disclosure was justified or harmless. Thus, the District Court abused its discretion by failing to conduct any analysis under Federal Rule of Civil Procedure 37(c)(1) before denying the objection.

Finally, the admission of this evidence was prejudicial to Coastal Ranches because the District Court found that the Culverts did not harm SC Steelhead populations—despite finding they block all access—because it found the habitat upstream of the Culverts was of uncertain quality and may not provide a

meaningful benefit to the population. *See* 1-ER-0009–10, FFCL ¶¶ 37-44 (fact); 1-ER-0012, FFCL ¶ 6.d (law). While the District Court does not specifically cite Dr. DeVries' testimony on this point (*id.*), the testimony is the only evidence contradicting Appellant's evidence that the habitat is of high quality above the Culverts.

Because admitting Dr. DeVries' opinions regarding upstream habitat was improper and prejudicial, the District Court abused its discretion.

## CONCLUSION

For the reasons stated in Argument, Sections I-III above, this Court should find that (1) the District Court applied an incorrect standard of law, which required a population-level impact for take; (2) the factual findings of the District Court necessitate finding that the Barriers caused "take" in violation of ESA section 9, 16 U.S.C. § 1538(a)(1)(B); and (3) the District Court abused its discretion and committed reversible error by admitting undisclosed expert testimony. Thus, the Court should remand to the District Court to find Appellee liable for violating ESA section 9, and to issue an appropriate remedy.

Date: October 13, 2026

Respectfully Submitted,

AQUA TERRA AERIS LAW GROUP

/s/ Erica A. Maharg
Erica A. Maharg
Attorneys for Appellant
COASTAL RANCHES CONSERVANCY

SYCAMORE LAW

/s/ Daniel Cooper
Daniel Cooper
Attorneys for Appellant
COASTAL RANCHES CONSERVANCY

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-4017

I am the attorney or self-represented party.

**This brief contains** 11,737 **words,** including 42 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ______.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Erica Maharg **Date** October 13, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*